# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| KATHLEEN C. MARTIN, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 14-cv-2182 (RC) |
| | : | | |
| v. | : | Re Document No.: | 14 |
| | : | | |
| OMNI HOTELS MANAGEMENT | : | | |
| CORPORATION, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

On June 12, 2014, Plaintiff Kathleen Martin tripped on a mat and fell in the lobby of the

Omni Shoreham Hotel, a hotel located in Washington, DC and owned by Defendant Omni

Hotels Management Corporation ("Omni"). Ms. Martin alleges that the mat, located near a hotel

entrance, was in a dangerously wrinkled condition prior to her accident—a condition that caused

her fall and the resulting injuries. Ms. Martin sued Omni, claiming that Omni's negligence

caused her personal injuries. Omni has moved for summary judgment, contending that Ms.

Martin is unable to prove that her injuries were proximately caused by any negligence on the part

of Omni. For the reasons explained below, the Court will grant Omni's motion for summary

judgment.

## II. FACTUAL BACKGROUND

The Court views the evidence in the light most favorable to Ms. Martin and draws all

justifiable inferences in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

(explaining that at summary judgment "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor").

Omni operates and manages the Omni Shoreham Hotel located at 2500 Calvert Street, N.W., in Washington, DC (the "Omni hotel"). *See* Def.'s Answer & Affirmative Defenses ¶ 4, ECF No. 1-4 (filed with Notice of Removal) [hereinafter Def.'s Answer]. At approximately 6:10 PM on June 12, 2014, Kathleen Martin, a registered guest at the Omni hotel, walked through the Parkview Lobby, located on the hotel's eastern side. *See* Def.'s Stmt. Material Facts ¶ 2, ECF No. 14; *see also* Am. Compl. ¶ 2, ECF No. 1-1 (filed with Notice of Removal). As she approached the hotel's exit, Ms. Martin tripped over the raised, wrinkled rubber edge of a mat located directly in front of a glass doorway. *See* Def.'s Stmt. Material Facts ¶¶ 2–3; *see also* Am. Compl. ¶ 2. That wrinkled edge caused Ms. Martin to fall to the floor and, as she fell, Ms. Martin struck her head, right arm and wrist, and left knee. *See* Def.'s Stmt. Material Facts ¶ 3; Am. Compl. ¶ 2. As a result of her fall, Ms. Martin sustained a fractured right humerus and injuries to her right wrist and left knee. *See* Pl.'s Answers Def.'s 1st Interrog. ¶ 6, ECF No. 14-2. Ms. Martin was hospitalized for two days at Georgetown University Hospital in Washington, DC, and required follow-up treatment near her home in Illinois. *See id.* She filed suit against Omni, claiming that her fall was the direct and proximate result of Omni's negligence, because Omni failed to maintain the lobby in a reasonably safe condition. *See* Am. Compl. ¶ 5.

Dr. Herbert Sohn, who was traveling with Ms. Martin, took several photos of the mat on which Ms. Martin tripped (the "Subject-mat") shortly after her fall. *See* Pl.'s Ex. 13, ECF No. 15-3. Additionally, Dr. Sohn testified that, after Ms. Martin fell, he observed other individuals tripping over the mat. *See* Dep. Herbert Sohn at 48:19–49:11, ECF No. 15-1 [hereinafter Sohn Dep.]. The incident was also captured by Omni's security camera, which records 24-hour footage

of the hotel's lobby. *See* Dep. Ralphaello McKeython at 33:8–37:9, ECF No. 17-3 [hereinafter McKeython Dep.]. The recorded surveillance footage shows a man attempting to flatten the mat shortly after Ms. Martin's fall. *See* Dep. Lawrence C. Dinoff at 147:2–148:1, ECF No. 14-3 [hereinafter Dinoff Dep.]. Ralphaello McKeython, Omni's security director, testified that he had the Subject-mat removed from the lobby after Ms. Martin's fall and that he examined it, but did not find any defects. *See* McKeython Dep. at 17:20–18:4, 19:6–14.

For purposes of this lawsuit, Ms. Martin retained an expert witness, Lawrence C. Dinoff. Mr. Dinoff is an architectural engineer who has been involved in developing the American Society for Testing and Materials' ("ASTM") national standards for safe walkways. *See* Dinoff Dep. at 54:2–56:11. Those guidelines include specific standards regarding the use of mats and the avoidance of tripping hazards. *See id.* at 54:18–55:1; *see also* Rule 26(a)(2) Stmt. Lawrence C. Dinoff at 1–2, Pl.'s Ex. 12, ECF No. 15-3, [hereinafter Dinoff Stmt.]. And Mr. Dinoff testified that he has "been involved in the development of every walkway safety standard coming out of ASTM for more than ten years," and "wrote the section dealing with the need to keep floor mats tight to the floor without loose edges." Dinoff Dep. at 55:7–13.

Mr. Dinoff examined the Subject-mat on February 25, 2016, at which point the mat was not in a wrinkled condition.[1] *See* Dinoff Dep. at 127:6–12; 128:3–9. Based on his examination,

---

[1] Mr. Dinoff testified that the condition of the mat he examined was different from the condition of the mat visible in the security camera footage (because the mat he examined did not have wrinkles present). *See* Dinoff Dep. at 127:6–129:2. Based on this observation, Mr. Dinoff concluded that the mat he examined was either a different mat or the same mat but in a different condition. *See id.* at 127:18–128:2, 128:19–129:2. He nevertheless made conclusions based on the nature of the mat he examined, assuming it to have the same characteristics as the Subject-mat. *See, e.g., id.* at 102:20–103:15, 125:4–7. Omni does not dispute the foundation for Mr. Dinoff's opinion testimony on this ground, or otherwise contest that the mat he examined, even if not the same one, was not substantially similar to the Subject-mat. Therefore, for purposes of resolving this motion, the Court assumes that a reasonable jury could find that the mat Mr.

Mr. Dinoff came to two conclusions. First, he concluded that the mat had what he called "short-term memory"—that, in other words, the mat would "self-correct[]" to the configuration it had held at the time when it was laid, whether that initial condition was wrinkled or flat. *Id.* at 64:8–21, 102:20–103:15, 126:2–9. From the hotel security video footage and Dr. Sohn's photographs, Mr. Dinoff observed that the Subject-mat's wrinkles were present in substantially the same location both before and after Ms. Martin's fall. *Id.* at 63:16–64:21; *see also id.* at 98:7–101:15. Based on the mat's "short-term memory," this fact suggested to Mr. Dinoff that the mat would not "change its curled-edge configuration in the short term," and "could not unmake a ripple in a short period of time." *Id.* at 64:11–64:21. Thus, Mr. Dinoff concluded that, in his opinion, at the time of Ms. Martin's fall the wrinkles in the Subject-mat were "[p]ermanent" features of the mat "in the short term." *Id.* at 64:17–21.

Second, Mr. Dinoff concluded that those wrinkles could only be formed over a lengthy period of time. *See id.* at 64:11–16, 125:4–127:12. For that reason, Mr. Dinoff opined that the wrinkles were likely formed by the manner in which the mat had been stored and thus must have been present at the time the mat was laid. *See id.* at 57:12-61:8, 64:17–21, 125:4–127:3. He testified that transitory wrinkles—or wrinkles formed, for example, by a disruption caused by another hotel guest traversing the mat—could not occur, because it would take "hours and hours, if not days and days" for wrinkles like the ones that caused Ms. Martin's fall to form. *Id.* at 125:4–7, 127:3–12. He stated that "[a] mat of this construction will not take on new shapes in a short period of time." *Id.* at 127:10–12. By contrast, Mr. Dinoff concluded that storage of the mat for a substantial period of time in a folded position could create such wrinkles. *See id.* at 57:12–

---

Dinoff tested was either the Subject-mat or a mat that shared the same properties as the Subject-mat, and could credit his testimony accordingly.

61:8. Thus, Mr. Dinoff concluded that the mat must have been in a wrinkled condition when it was laid, and that the wrinkles could not have been caused by another guest at the hotel. *See id.* at 63:16–66:13; *see also* Dinoff Stmt. at 7.

Neither party knows definitively when the mat was laid or who laid it. *See, e.g.*, Pl.'s Stmt. Material Facts ¶ 18, ECF No. 15 (stating that, without additional video footage, "nobody can determine how long the mat was in place"). Omni admits that mats are generally laid in the lobby by attendants to ensure that the entrance and interior walkway are kept dry during inclement weather. *See* Def.'s Answers. & Objs. Pl.'s Interrog. at 9, ECF No. 15-2, [hereinafter Def.'s 1st Interrog. Answers]; Def.'s Suppl. Answers & Objs. Pl.'s 2d Interrog. at 3, ECF No. 14-4, [hereinafter Def.'s 2d Interrog. Answers].[2] But weather reports contained in the record indicate that it rained on each day between June 8, 2014, and June 12, 2014, the day of Ms. Martin's fall. *See* Pl.'s Ex. 9, ECF No. 15-3. Omni is also unaware of who laid the Subject-mat or how it was stored. *See* Def.'s 2d Interrog. Answers at 3.

Now before the Court is Omni's motion for summary judgment, which contends that Ms. Martin is unable to establish from the record evidence that Omni had actual or constructive notice of any dangerous condition caused by the mat. *See generally* Def.'s Stmt. P. & A. Supp. Mot. Summ. J., ECF No. 14 [hereinafter Def.'s Mem. Supp.]. Ms. Martin argues, however, that a reasonable jury could conclude that Omni created the dangerous condition by placing the mat in the lobby with wrinkled edges (and that other persons traversing the mat could not have caused the wrinkles) and that, to the extent Omni asserts that it lacked notice of any dangerous

---

[2] Because these documents do not include their own page numbers, and they were uploaded in a combined ECF file that shares one ECF number, for purposes of citing to Defendants' interrogatory and supplemental interrogatory answers, the Court will cite to the page numbers generated by ECF.

condition, an adverse inference is warranted in light of the fact that Omni did not preserve more

of the hotel surveillance videotape. *See* Pl.'s Mem. P. & A. Opp'n Def.'s Mot. Summ. J. at 1–2,

ECF No. 16 [hereinafter Pl.'s Opp'n]. As explained below, the Court will grant Omni's motion.

### III.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary

judgment if "the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one

capable of affecting the substantive outcome of the litigation. *See Anderson*, 477 U.S. at 248. A

dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the

non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). The inquiry under Rule 56 is

essentially "whether the evidence presents a sufficient disagreement to require submission to a

jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477

U.S. at 251–52.

The principal purpose of summary judgment is to determine whether there is a genuine

need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v.

Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying

portions of the record that demonstrate the absence of any genuine issue of material fact. *See*

Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to

specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P.

56(c)(1); *Celotex*, 477 U.S. at 324. The non-movant may not rest upon mere allegations or

denials but must instead present affirmative evidence. *Laningham v. U.S. Navy*, 813 F.2d 1236,

1241 (D.C. Cir. 1987) (citing *Anderson*, 477 U.S. at 257).

In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). All underlying facts and inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## IV.  ANALYSIS

To succeed in a negligence action under District of Columbia law, the plaintiff "bears the burden of proof on three issues: 'the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury.'" *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C. 1988) (quoting *Meek v. Shepard*, 484 A.2d 579, 581 (D.C. 1984)).[3] The dispute in this case revolves almost exclusively around the second prong: demonstrating a deviation from the standard of care.

### A.  Standard of Care

In the District of Columbia, "there is only one standard of care for persons lawfully upon the landowner's or land occupier's property," namely, "reasonable care under the

---

[3] The Court concludes that District of Columbia tort law governs this case. The parties do not address choice of law in their memoranda, although neither seems to contest the application of District of Columbia law, as each party cites that law exclusively. This Court applies the choice of law principles of the District of Columbia, the jurisdiction in which the Court sits. *See Wu v. Stomber*, 750 F.3d 944, 949 (D.C. Cir. 2014). District of Columbia's choice of law rules require the Court to "apply the tort law of the jurisdiction that has the most significant relationship to the dispute." *Id.* (internal quotation marks omitted). As the place where the injury and the conduct allegedly causing the injury occurred, and where the relationship between the parties is centered, the District of Columbia has the most substantial relationship to the dispute. *See id.* Thus, D.C. law applies.

circumstances." *Sandoe v. Lefta Assocs.*, 559 A.2d 732, 742 (D.C. 1988). In some cases, however, "when the subject matter at issue is so distinctly related to some science, profession, business, or occupation as to be beyond the ken of the average lay person," what constitutes reasonable care in that context "must be established through expert testimony." *Rajabi v. Potomac Elec. Power Co.*, 650 A.2d 1319, 1322 (D.C. 1994). In such cases, an expert must "articulate and refer to a standard of care by which the defendant's actions can be measured" and "at the very least," specify both "what standards were violated and how they were violated." *Sullivan v. AboveNet Commc'ns, Inc.*, 112 A.3d 347, 357–58 (D.C. 2015) (quoting *District of Columbia v. Carmichael*, 577 A.2d 312, 314 (D.C. 1990)) (internal quotation marks omitted). Mere "[g]eneralized references to national standards are insufficient to establish a standard upon which the defendant's actions can be measured." *Id.* at 358 (internal quotation marks and citation omitted).

Omni does not contend that expert testimony is necessarily required in this case, but to the extent that it is, Ms. Martin has provided it. The testimony of Ms. Martin's expert, Lawrence Dinoff, provides sufficient information from which a jury could determine the relevant standard of care Omni owed to Ms. Martin. In his deposition and his Rule 26(a)(2) Statement, Mr. Dinoff referenced several national standards relating to pedestrian walkway safety. *See* Dinoff Dep. at 54:16–55:1; Dinoff Stmt. at 3–5. Mr. Dinoff explained that adherence to the standards he cited, while "not statutorily required," is "not optional." *See* Dinoff Dep. at 146:2–21. Indeed, he opined that adherence to these standards is "required if you want to be safe." *Id.* at 146:21–147:1.

Specifically, Mr. Dinoff identified a standard referred to as ANSI/ASTM F1637-13 which describes standards for safe walkways and includes provisions that relate to mats and

preventing tripping. *See* Dinoff Stmt. at 3–4; *see also, e.g.*, Dinoff Dep. at 61:9–62:7. Mr. Dinoff

was involved with the development of ASTM F1637, and for the past five years has been the

chairman of the task force for that standard. *See* Dinoff Dep. at 54:16–55:9. ASTM F1637

instructs that walkway mats should feature a "safe transition from adjacent surfaces and shall be

fixed in place or provided with slip resistant backing." Dinoff Stmt. at 3–4 (quoting

ANSI/ASTM F1637-13, *Standard Practice for Safe Walking Surfaces*, § 5.4). Moreover, the

standard mandates that "[m]ats . . . shall be maintained so as not to create pedestrian hazards

[and] shall not have . . . wrinkles or other hazards that may cause trip occurrences." *Id.* at 4

(quoting ANSI/ASTM F1637-13, *Standard Practice for Safe Walking Surfaces*, § 5.4). Mr.

Dinoff's expert statement also refers to several other national standards regarding walkway

safety. *See id.* at 4–5. Based on this evidence, the Court concludes that Ms. Martin has provided

sufficient information for a jury to conclude that the standard of care Omni owed to Ms. Martin

at least required Omni to lay and maintain the mat in a safe, wrinkle-free condition.

### B.  Deviation from the Standard of Care

The Court turns next to Omni's purported deviation from or breach of the standard of

care. Although Omni does not appear to concede that a wrinkle was present prior to Ms. Martin's

fall, *see, e.g.*, Def.'s 1st Interrog. Answers at 9 ("Defendant is unaware of any instance where

Defendant was notified that a rug-mat was a tripping hazard for hotel guests"), at the summary

judgment stage, factual disputes are resolved in favor of the non-movant, Ms. Martin, *see*

*Anderson*, 477 U.S. at 255. Several pieces of evidence suggest that a wrinkle was present at the

time of Ms. Martin's fall. For example, Mr. Dinoff testified that wrinkles were visible in the

security camera footage immediately prior to the accident. *See* Dinoff Dep. at 63:16–66:13. Dr.

Sohn took photographs directly after the accident which show those wrinkles. *See* Pl.'s Ex. 13,

ECF No. 15-3. And Mr. Dinoff testified that the wrinkles present in those photos matched the locations of the wrinkles in the video footage. *See* Dinoff Dep. at 82:14–84:8. Consequently, a reasonable jury could find, based on this evidence, that a wrinkle was present at the time of Ms. Martin's fall and that the wrinkle caused her fall.[4]

Nevertheless, to succeed in opposing Omni's motion for summary judgment, Ms. Martin must show that a reasonable jury could conclude that Omni was negligent "*either* in creating a dangerous condition or in allowing one to continue without correction." *Thomas v. Grand Hyatt Hotel*, 749 F. Supp. 313, 314 (D.D.C. 1990) (emphasis added) (quoting *Paylor v. Safeway Stores, Inc.*, 225 A.2d 312, 314 (D.C. 1967)) (internal quotation marks omitted). These two routes to show a deviation are stated in the alternative. A plaintiff can show that the defendant "had actual or constructive notice of a dangerous condition that he failed to correct," *Croce v. Hall*, 657 A.2d 307, 310 (D.C. 1995), but if "the landowner (or his agent) is responsible for creating the dangerous condition, the plaintiff need not show notice,"[5] *id.* at 310, n.6 (citing *Sandoe*, 559 A.2d at 740); *see also Sandoe*, 559 A.2d at 740 (discussing model jury instruction that provided that a defendant is "responsible, of course, for injuries resulting from risks created personally or by his employees" and, "[m]oreover, his obligation of due care extends to

---

[4] Omni does not appear to dispute that a reasonable jury could conclude that the wrinkle was the proximate cause of Ms. Martin's fall and her injuries. When asked whether it was possible that Ms. Martin could have fallen regardless of the condition of the mat, Mr. Dinoff testified: "I don't think so." Dinoff Dep. at 81:15–18. He explained that "the event that I saw in the video says clearly that [her fall] was because her foot was stopped by the mat." *Id.* at 81:19–21. Thus, a reasonable jury could conclude, based on Mr. Dinoff's testimony (and, conceivably, the video footage of Ms. Martin's fall, itself) that the wrinkle was the proximate cause of Ms. Martin's injuries.

[5] District of Columbia cases do not explicitly spell out the logic behind this distinction but, in the Court's view, it proceeds inherently from an understanding that, if a defendant or his agent creates a hazard, the defendant necessarily obtains actual, or at the very least constructive, notice of the hazard.

reasonable supervision and inspection of the premises to identify and protect against potential perils" (emphasis and internal citation omitted)).

Thus, the operative question becomes whether Ms. Martin can point to sufficient evidence from which a reasonable jury could find that Omni *either*: (1) created the wrinkles in the Subject-mat, or (2) had actual or constructive notice of the wrinkles and failed to remedy the danger. Ms. Martin contends that she has sufficient evidence to meet the first showing, and that the jury should be permitted to make an adverse inference on the second. *See* Pl.'s Opp'n at 1–2. The Court will address each theory.

### 1.  Creation of the Hazard

Ms. Martin primarily contends that there is a genuine issue as to whether Omni created the hazardous condition. Specifically, Ms. Martin alleges that Omni created the tripping hazard by storing the mat in a way that produced wrinkles and then negligently laying the Subject-mat in that wrinkled condition. *See* Pl.'s Opp'n at 5–11. Getting to this conclusion requires drawing several inferences from the record: first, that the mat had the "short term memory" necessary to retain a wrinkle; second, that such a wrinkle would take many hours to form, and could not be formed by a more limited disturbance; third, that the amount of time required to form the wrinkles necessarily meant that the mat must have been placed in a wrinkled condition; and, fourth, that an Omni employee laid the mat. Omni contends that the jury could only arrive at several of these logical links by engaging in speculation. *See* Def.'s Reply Supp. Mot. Summ. J. at 3–6, ECF No. 17 [hereinafter Def.'s Reply].

At the summary judgment stage, the Court must assess whether there is sufficient non-speculative evidence to support a verdict in favor of the non-movant. When doing so, the Court must not make credibility determinations, which is the province of the jury. *See Czekalski*, 475

F.3d at 363. Moreover, if several "different inferences" can be drawn from a body of evidence, "a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them to be the most reasonable inference." *Pa. R.R. Co. v. Pomeroy*, 239 F.2d 435, 442 (D.C. Cir. 1956) (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)). At the same time, however, while "[a] jury is entitled to draw a vast range of reasonable inferences from evidence," it "may not base a verdict on mere speculation," alone. *United States v. Long*, 905 F.2d 1572, 1576 (D.C. Cir. 1990). The Court must therefore distinguish between "logical deduction and mere conjecture." *Giordano v. Sherwood*, 968 A.2d 494, 498 (D.C. 2009) (quoting *Majeska v. District of Columbia*, 812 A.2d 948, 950 (D.C. 2002)). "The possibility that a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary judgment." *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 631 (D.C. Cir. 2010) (quoting *Montgomery v. Chao*, 546 F.3d 703, 708 (D.C. Cir. 2008)) (ellipses in original).

At times, the testimony of an expert witness can assist the jury in bridging the gap between the evidence in the record and the reasonable inferences that may be drawn from that evidence. Indeed, "the purpose of expert testimony is to avoid jury findings based on mere conjecture or speculation," and "[t]he sufficiency of the foundation for [expert] opinions should be measured with this purpose in mind." *Giordano*, 968 A.2d at 498 (alteration in original) (internal quotation marks and citations omitted). An expert's opinion, however, must also be based on fact or adequate data. *See id.* at 502; *cf. Ambrosini v. Labarraque*, 101 F.3d 129, 134 (D.C. Cir. 1996) (noting that a court must perform a "'gatekeeper' role as a check on 'subjective

belief' and 'unsupported speculation'" in expert evidence (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)).[6]

Here, the record does contain evidence from which a jury could find some of the links in the logical chain necessary to conclude that Omni created the hazard. First, a jury reasonably could conclude that an Omni employee laid the mat. At a few points in its briefing, Omni appears to imply that the record lacks evidence that an Omni employee laid the mat. *See, e.g.*, Def.'s Reply at 6 ("Plaintiff is still unable to identify any evidence of . . . who placed the Subject-mat."). But the Court does not take Omni to seriously suggest that an outside individual who was not affiliated with Omni entered the hotel to place a mat by the door during or after a rain storm. And, in any event, a jury could find by a preponderance of the evidence that the Subject-mat was laid by an Omni employee. Omni admits that mats like the Subject-mat are "generally placed in the Parkview Lobby by Lobby Attendants." Def.'s 2d Interrog. Answers at 3. Additionally, Omni admits that it owned the mat at the time of Ms. Martin's fall. Def.'s 1st Interrog. Answers at 8. Indeed, Omni employees removed and replaced the Subject-mat after Ms. Martin's fall. McKeython Dep. at 19:6–22:20. And Mr. McKeython agreed during his deposition that it is "safe to say" that the mats are stored "someplace in the hotel." *Id.* at 22:14–23:1. Based on Omni's ownership of the mat and the hotel's general pattern of storing, replacing, and

---

[6] As part of a *Daubert* analysis, a Court must ask whether an expert's testimony is based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. A "trial judge . . . must find that [the proffered testimony] is properly grounded, well-reasoned and not speculative before it can be admitted." Fed. R. Evid. 702 advisory committee's note. To be clear, Omni's motion for summary judgment does not appear to raise a *Daubert* issue or seek the *exclusion* of Mr. Dinoff's testimony in total or on this point. Nevertheless, the Court must ask whether a jury could appropriately credit Mr. Dinoff's conclusion without engaging in improper speculation.

removing these types of mats, a jury could reasonably infer that Omni placed the mat in the Parkview Lobby sometime prior to Ms. Martin's fall.

Second, based on Mr. Dinoff's testimony, a jury could reasonably conclude that the Subject-mat had short-term memory characteristics and that, at the time of Ms. Martin's fall, the mat was in a wrinkled state as a result of some prior disturbance. On this point, Mr. Dinoff's conclusions about the mat's short-term memory and its characteristics at the time of Ms. Martin's fall are the result of reasonable inferences from record evidence. Mr. Dinoff testified that the mat had a form of short-term memory, whereby it "self-corrects to its current state," such that "[i]f it's flat and you lift it, it will reflatten," but "[i]f it's wrinkled and you lift it, it will rewrinkle." Dinoff Dep. at 126:1–6; *see also id.* at 125:4–7. This conclusion was based on his observation that the mat he examined returned to its current configuration when it was disturbed. The current state of the mat when Mr. Dinoff inspected it was flat. Thus, when he used the toe of his shoe to kick the edge, he was able to create a bubble in the middle of the mat, but he was not able to create a wrinkled edge like the one over which Ms. Martin tripped. *See id.* at 103:6–15. Instead, the mat righted itself after it was kicked. *See id.* He therefore concluded that, if the mat was wrinkled at the time of Ms. Martin's fall, it would have to be because it was self-correcting to a prior, wrinkled state. *See id.* at 125:13–126:11.

This observation was further supported by evidence Mr. Dinoff reviewed from the video footage and the photographs taken by Dr. Sohn. From the video and the photos, Mr. Dinoff concluded that the mat had "substantially the same" wrinkles both before and after Ms. Martin's fall. *See id.* at 145:9–146:1. Specifically, based on the video footage showing the seconds leading up to the accident, Mr. Dinoff identified several wrinkles in the mat, which he distinguished based on shadows cast by the raised edges. *See id.* at 157:6–163:15; *see also id.* at 98:7–101:15

(testifying that Ms. Martin's shoe went under the mat, which required that wrinkles be present that are "raised up above the floor more than [an] eighth inch"). Additionally, Mr. Dinoff testified that he could identify wrinkles from the video footage that were in substantially the same condition and location as the wrinkles shown in the photos Dr. Sohn took after the accident. *See id.* at 63:16–64:21. Furthermore, Dr. Sohn, himself, testified that, after Ms. Martin fell, he observed others tripping over the mat, suggesting that the mat returned to a wrinkled state. *See* Sohn Dep. at 48:19–49:11. This evidence indicates that the wrinkles were present in substantially the same form both before and after Ms. Martin's fall. Coupled with evidence from his own examination, Mr. Dinoff concluded that the mat has a form of "memory" whereby it returns to its original configuration. *See* Dinoff Dep. at 65:6–15. Because the mat returned to a wrinkled state after Ms. Martin trip, he concluded that the Subject-mat was in a wrinkled state at the time of her accident, and had developed a wrinkled edge that was "[p]ermanent in the short term," and not a feature that was only present momentarily. *See id.* at 64:20–21.

Together, the jury could conclude from this evidence that the mat featured a form of "short-term" memory, that at the time of Ms. Martin's fall the mat was self-correcting to a prior wrinkled state, and that an Omni employee placed the mat upon which Ms. Martin tripped. Yet, the evidence in the record is insufficient to establish a link critical to Ms. Martin's theory that Omni created the condition: Mr. Dinoff's testimony that it would take "hours and hours, if not days and days" to form the type of wrinkle that would be retained by the mat's short term memory. *See* Dinoff Dep. at 126:17–127:3. It is only through this conclusion that Mr. Dinoff is able to infer that the wrinkle could only be formed in storage and was necessarily in a wrinkled state, caused by Omni, at the time it was laid. *See id.*; *see also* Pl.'s Opp'n at 9 (explaining this

testimony and stating that Mr. Dinoff "was unequivocal in maintaining that the wrinkles . . . existed from the time the mat was placed on the floor at that location").[7]

The record contains no evidence from which a jury could reasonably infer—without resorting to speculation—that the mat was necessarily wrinkled at the time it was laid or that an alternative type of disturbance could not have formed wrinkles that would be retained by the mat's short term memory. Mr. Dinoff does not provide any factual foundation for his opinion that it would have taken a very lengthy period of time to form such wrinkles. Thus, his opinion on this score is mere speculation—and supported only by his bare assertion that it would take "hours and hours, if not days and days" for those wrinkles to form. *See* Dinoff Dep. at 127:2–3.[8] When asked for the basis of this opinion, he responded, vaguely, that it was based on the fact that a mat "of this construction" would not form wrinkles in "a short period of time." *Id.* at 127:6–12; *see also id.* at 125:4–7 (opining that a "heavy mat," in the same "condition" as the mat he inspected, would not form "transitory wrinkles," but failing to articulate his basis for that

---

[7] Although Ms. Martin contends that Omni's storage of the mat produced the wrinkles, she does not contend that Omni's storage of the mat, *itself*, breached any recognized standard of care for the storage of mats. *See* Pl.'s Opp'n at 6; Pl.'s Resp. to Def.'s Req. Admis. ¶ 22, ECF No. 14–2. Instead, she argues that Omni's negligence was in *laying* the mat in a wrinkled state, creating the dangerous condition to herself and others lawfully on the premises. *See* Pl.'s Opp'n at 10; Dinoff Dep. at 60:14–61:8. Thus, in Ms. Martin's view, the relevant inquiry regarding negligence is not how the mat was stored but whether, however it was stored, the mat was wrinkled when it was laid.

[8] Omni also emphasizes that there is no definite evidence in the record as to when the Subject-mat was laid or how long the Subject-mat would retain its shape, and argues that Mr. Dinoff's testimony merely assumes, without any factual basis, "that one unknown length of time (i.e. how long the Subject-mat will hold its shape) was longer than a second unknown length of time (i.e. how long the Subject-mat was in the Parkview Lobby prior to the [i]ncident)." Def.'s Mem. Supp. at 12. This concern is problematic for Ms. Martin's claims, but the Court need not determine whether it would independently require granting summary judgment in Omni's favor, in light of the Court's conclusion that there is no evidence to support Mr. Dinoff's testimony that the wrinkles in the Subject-mat would take hours and hours to form in order to be retained by the Subject-mat's short term memory.

opinion). To be sure, because Mr. Dinoff kicked the flat mat with his toe during his examination

and was unable to create a wrinkle, his testimony could support an inference that more than a

single kick to the mat is necessary to form a wrinkle. *See id.* at 103:6–15. Yet, Mr. Dinoff

acknowledged that he "didn't do testing of ways to make this mat ripply." *Id.* at 59:6–12.

Beyond his global assertion that such a wrinkle could not be created through a momentary kick,

but could be created through extended storage in a folded position, his testimony does not

disclose any basis for concluding how long it would take to create a wrinkle like the one that

caused Ms. Martin's fall.

Mr. Dinoff's testimony states that his sole basis for his opinion that it would take "hours

and hours" to create the wrinkle was "[t]he nature of the mat [Omni] made available for my

inspection," and his conclusion that "[a] mat of this construction will not take on new shapes in a

short period of time." *Id.* at 127:6–12. Yet, neither Mr. Dinoff's deposition testimony nor his

expert statement provide any factual or methodological underpinning for that conclusion. In

order to conclude that the wrinkles were present at the time the Subject-mat was laid, the jury

would have to credit Mr. Dinoff's unsupported assertion that wrinkles that will be retained in the

mat's "short-term memory" can only be formed over hours and hours. But "[t]he possibility that

a jury might speculate in the plaintiff's favor . . . is simply insufficient to defeat summary

judgment." *Athridge*, 604 F.3d at 631 (quoting *Montgomery*, 546 F.3d at 708) (ellipses in

original). Ms. Martin has provided the jury with no grounds to conclude that such a wrinkle

would require an extended period of time to form.  And without concluding that it would have

taken a very lengthy period of time to form the wrinkles, a jury could not conclude that Omni

created the dangerous condition because they would have no factual foundation to reject, without speculating, the possibility that the wrinkle was created after the mat was laid.[9]

### 2. Failure to Discover and Remedy the Hazard

Alternatively, Ms. Martin can attempt to show a deviation from the standard of care by demonstrating that Omni "had actual or constructive notice of a dangerous condition that [it] failed to correct." *Croce*, 657 A.2d at 310. Ms. Martin claims that she should be entitled to an adverse inference of liability to counter Omni's asserted lack of notice, in light of Omni's failure to retain the portion of the surveillance video footage showing when, how, and by whom the mat was laid. *See* Pl.'s Opp'n at 1, 11–13.

### a. Actual or Constructive Notice

Beyond her assertion that an adverse inference is warranted in this case, Ms. Martin does not appear to argue that other evidence in the record raises a genuine issue of material fact regarding notice or would permit a reasonable jury to conclude that Omni had actual or constructive notice of the Subject-mat's wrinkled condition.

Omni, as the operator of the hotel, "is liable for dangerous conditions that are discoverable in the exercise of ordinary care." *Sandoe*, 559 A.2d at 742 (internal quotation marks omitted). In order to defeat summary judgment, Ms. Martin must show that Omni had actual or constructive notice of the dangerous condition and failed to remedy that danger. *See Rajabi v. Potomac Elec. Power Co.*, 650 A.2d 1319, 1322 (D.C. 1994). Beyond her claim that Omni

---

[9] Although the Court interprets Ms. Martin's request for an adverse inference as connected solely to the issue of notice, *see, e.g.*, Pl.'s Opp'n at 11 ("Omni's defense that it lacked notice of the danger is baseless after it destroyed (or allowed to be destroyed) *the only proof of such notice*." (emphasis added)), to the extent Ms. Martin also seeks an adverse inference that Omni created the condition—perhaps because the video might also show whether the same wrinkles were present when the mat was laid—the Court finds that such an inference is not warranted for the same reasons explained below. *See infra*, Part IV.B.2.b.

created the hazard, Ms. Martin does not contend that Omni had *actual* notice of the wrinkles.[10]

To show constructive notice, Ms. Martin "must present evidence that a dangerous condition

existed for such a duration of time that had reasonable care been exercised the hazard would

have been discovered." *Wilson v. Wash. Metro. Area Transit Auth.*, 912 A.2d 1186, 1190 (D.C.

2006). When a plaintiff "proves only that a hazard existed for an undetermined period of time,

she has not shown that the defendant had constructive notice." *Wise v. United States*, 145 F.

Supp. 3d 53, 66 (D.D.C. 2015) (quoting *Wilson*, 912 A.2d at 1190).

Ms. Martin does not point to any evidence from which the jury could determine how long

the mat was in place *or*, without accepting Ms. Martin's creation-of-the-hazard theory, how long

the wrinkle was present in the mat. Thus, from this record no reasonable jury could conclude that

the wrinkle "existed for such a duration of time that had reasonable care been exercised the

hazard would have been discovered." *Wilson*, 912 A.2d at 1190. Even Ms. Martin essentially

acknowledges as much in her brief, conceding that "[n]otice plainly cannot be shown without

more pre-incident video footage." Pl.'s Opp'n at 12; *see also id.* at 2 (referring to the missing

video footage as the "only evidence establishing such notice"). Because Ms. Martin does not

know how long the wrinkle (or even the Subject-mat itself) was present in Parkview Lobby, she

---

[10] Instead, Ms. Martin asserts that Omni's employees were "negligent by *not* seeing the
wrinkled edges at the time of placement" and "*not* recognizing the mat was a tripping hazard,"
and thus "not remedying the problem." Pl.'s Stmt. Material Facts ¶ 24 (citing Dinoff Dep. at
60:19–61:8, 123:8–15) (emphasis added). Mr. Dinoff does assert that Omni had actual notice of
the wrinkles, but that notice was tied to his assertion that the hazard was created when the mat
was laid. *See* Dinoff Dep. at 149:21–150:1 (responding, when asked whether the individual who
laid the mat saw the wrinkles: "Absolutely, because the mat was wrinkled from the moment it
was put down.").

is unable to prove that Omni had constructive notice of the wrinkle based on the length of time the dangerous condition existed.[11]

In passing, Ms. Martin's opposition does reference a claim that "Omni failed to discover the danger by inspecting the mat as necessary after two heavy rains that preceded Ms. Martin's fall." Pl.'s Opp'n at 1; *see also id.* at 10 n.4. But this theory fails for at least one fundamental reason[12]: any conclusion that inspecting the mats after the heavy rains would have provided

---

[11] At a few points, Ms. Martin does contend that weather reports concerning heavy rains on June 11 and 12 provide evidence from which a jury could infer that the mat was laid on one of those days. *See, e.g.*, Pl.'s Resp. to Def.'s Req. Admis. ¶ 1, ECF No. 14-2. Yet, as Omni points out, it also rained on June 8, 9, and 10—each of the three days preceding June 11. *See* Def.'s Mem. Supp. at 12 n.2 & Def.'s Exs. K, L, & M. Even accepting that a jury could credit Ms. Martin's account, absent Ms. Martin's creation-of-the-hazard theory, the weather report evidence only shows how long the mat was in place, not how long the wrinkle was apparent in the mat. And "proof of the period of time during which a condition *might have existed* does not permit an inference that the condition did exist during that entire period or any substantial part of it." *Hines v. Safeway Stores, Inc.*, 379 A.2d 1174, 1175 (D.C. 1978) (emphasis added). Thus, Ms. Martin has not presented any evidence that would allow a jury to reach a reasonable conclusion as to the length of time the *wrinkle* was present in the lobby prior to Ms. Martin's accident.

[12] At least two other hurdles also exist.  Most importantly, Mr. Dinoff failed to disclose this standard of care as a basis for his opinion in his expert report, and his deposition testimony failed to expressly connect it to his opinion that Omni was negligent.  Federal Rule of Civil Procedure 26(a)(2) requires expert disclosures to be made in an expert's report, *see* Fed. R. Civ. P. 26(a)(2), although, in practice, "a party is considered to have met its obligations for expert disclosure so long as all required information is divulged in either the written report or a subsequent deposition of the expert," *Iacangelo v. Georgetown Univ.*, 272 F.R.D. 233, 234 (D.D.C. 2011).  But an expert witness is rarely permitted "to testify about issues he did not address either in his deposition or in his expert report." *Halcomb v. Wash. Metro. Area Transit Auth.*, 526 F. Supp. 2d 24, 28 (D.D.C. 2007).  Thus, presentation of this opinion for the first time in a post-deposition affidavit is improper.

And even if the jury could consider it, Mr. Dinoff expresses the standard of care for inspecting the mats based on "environmental conditions" in only the most generalized terms. He states in his affidavit that "the standard of care requires keeping a mat reasonably dry and clean," and that, in his opinion, "the standard of care required Omni, soon after the heavy rainfall at 8–10pm on June 11 and 3–4pm on June 12, to inspect the lobby's entrance, floor, and mat for unsafe conditions." Aff. Lawrence C. Dinoff ¶ 3, Pl.'s Ex. 14, ECF No. 15-3; *see also* Dinoff Dep. at 125:8–12 ("So the only reason to inspect that mat is to see whether it is getting charged with water or dirt in a way that needs to be cleaned. That depends on the environmental conditions."). These vague references to the standard of care provide little more than "generalized references" to a standard of care, and are "insufficient to establish a standard upon

Omni with notice of the wrinkles again depends on an assumption that the Subject-mat was laid before those rain events, and that the wrinkles were present by that time. Mr. Dinoff asserted in an affidavit he supplied well after his deposition that had Omni inspected the lobby area, "the mat's wrinkled edges should have been discovered and corrective action taken before Ms. Martin tripped and fell." Aff. Lawrence C. Dinoff ¶ 3, Pl.'s Ex. 14, ECF No. 15-3. But without crediting Mr. Dinoff's speculative assertion that the wrinkles must have been present by the time the mat was laid, there is no evidence in the record from which the jury could infer, without speculating, that the wrinkles were present when Omni employees may have inspected the mats for water or dirt. *See Hines v. Safeway Stores, Inc.*, 379 A.2d 1174, 1175 (D.C. 1978) ("[P]roof of the period of time during which a condition *might have existed* does not permit an inference that the condition did exist during that entire period or any substantial part of it." (emphasis added)).

Thus, independent of Ms. Martin's creation-of-the-hazard theory, the record does not contain evidence from which a reasonable jury could conclude that the Subject-mat "remained in an unsafe condition so long that [Omni] ought to have known of it, if [Omni] had exercised reasonable care." *Rajabi*, 650 A.2d at 1322 (quoting *Jones v. District of Columbia*, 123 A.2d 364, 366 (D.C. 1956)).

### b.  Adverse Inference

Perhaps for that reason, Ms. Martin's opposition to Omni's motion for summary judgment claims that the jury should be permitted to draw an adverse inference regarding Omni's

---

which the defendant's actions can be measured." *Sullivan*, 112 A.3d at 358. Mr. Dinoff fails to explain what kind of environmental conditions require such inspection, why the rain storms on the 11th and 12th met those conditions, and how soon after a storm or how often the hotel should have inspected the mats. Regardless, even if Omni did inspect the mats, as explained above, there is no evidence other than Ms. Martin's creation-of-the-hazard theory from which the jury could infer that the wrinkles were present at those times.

notice of the hazard because Omni failed to preserve a greater portion of the videotape—what she characterizes as "the only proof of such notice." Pl.'s Opp'n at 11. For the Court to conclude that an adverse inference is warranted, Ms. Martin must prove three elements: "(1) the party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a culpable state of mind; and (3) the evidence that was destroyed or altered was relevant to [Ms. Martin's] claims . . . to the extent that a reasonable factfinder could conclude that the lost evidence would have supported [her] claims . . . ." *D'Onofrio v. SFX Sports Grp., Inc.*, No. 06-687, 2010 WL 3324964, at *6 (D.D.C. Aug. 24, 2010) (quoting *Mazloum v. D.C. Metro. Police Dep't*, 530 F. Supp. 2d 282, 291 (D.D.C. 2008)). Ms. Martin fails to establish at least the first and second of these elements.

As for the first element, the video footage was in Omni's control before it was destroyed. *See* McKeython Dep. at 33:8–37:9. However, Ms. Martin has not demonstrated any obligation on the part of Omni to preserve a more extensive portion of the footage than Mr. McKeython did on the day of the accident. An obligation to preserve evidence "can arise 'when a party should have known that the evidence might be relevant to future litigation.'" *Mazloum*, 530 F. Supp. 2d 282, 290 (D.D.C. 2008) (quoting *Kraus v. Gen. Motors Corp.*, No. 03-4467, 2007 WL 3146911, at *3 (S.D.N.Y. Oct. 24, 2007)). And, in fact, Mr. McKeython actively took steps to preserve the portions of the tape that he believed could be relevant. The incident was captured by Omni's security camera, which records 24-hour footage of the lobby. *See* McKeython Dep. at 33:8–37:9. As Mr. McKeython testified, the footage is automatically deleted in the regular course of business after 35 days. *See id.* at 36:22–37:9. On the day of the accident, Mr. McKeython, Omni's security director, reviewed the footage surrounding the time period of the accident and recorded a 50-second long portion, which included the incident itself. *See id.* at 36:3–21.

Ms. Martin now claims that Mr. McKeython "failed to retain earlier footage showing when the mat was placed in the lobby, by whom, and in what condition," which would have established "Omni's actual or constructive notice." Pl.'s Opp'n at 11. Yet, Ms. Martin has supplied no evidence showing that Omni knew or should have known that the far earlier footage might be relevant to future litigation. It was not until September 18, 2014—two months after the incident and, of course, after the tapes had been deleted in the regular course of business—that Omni was apprised of this lawsuit. *See* McKeython Dep. at 35:4–7; *see also* Letter from Christopher Mitchell to General Manager of Omni Shoreham Hotel dated Nov. 3, 2014, ECF No. 17-3 [hereinafter Pl.'s Ltr.] (referencing prior letter dated September 18, 2014). And it was not until after another two months had elapsed that Ms. Martin requested that Omni preserve any evidence—and even then Ms. Martin only requested that Omni preserve the Subject-mat itself. *See* Pl.'s Ltr. Ms. Martin's counsel made no reference to the video footage at that time. Furthermore, during Mr. McKeython's deposition on July 7, 2015, when asked whether he recorded the removal of the rug, Mr. McKeython replied, "No, I don't have that, because that wasn't important. I didn't even know I would see you." McKeython Dep. at 35:13–14.

Ms. Martin argues that Omni should have foreseen that video footage concerning when the mat was placed in the lobby, who placed the mat, and in what condition it was placed would be important to future litigation. But Ms. Martin fails to point to anything indicating such foresight was to be expected. As far as the Court can tell, the record indicates that Ms. Martin's theory that the mat was placed in a wrinkled condition was not apparent until many months later. In addition, Mr. McKeython testified that he found nothing wrong with the Subject-mat when he inspected it after Ms. Martin's fall. *See* McKeython Dep. 19:10–14. This indicates that Mr. McKeython had no obvious reason to preserve video concerning the condition of the mat at the

time it was placed or removed. Even during Mr. McKeython's deposition, Ms. Martin's counsel never asked whether Mr. McKeython noticed a wrinkle in the Subject-mat in the minutes or hours that preceded the portion he recorded, saw footage of who placed the Subject-mat, or noticed the condition of the Subject-mat when it was placed—information that Ms. Martin now claims to be crucial to her case. *See* McKeython Dep. at 33:15–37:12.[13] At Mr. McKeython's deposition, Ms. Martin's counsel only asked about footage of the events *following* the incident, including the removal of the mat. *See id.* at 34:22–35:14. Although Mr. McKeython indicated he watched at least a portion of the video concerning the time period prior to when Ms. Martin fell, counsel did not probe whether that period included the initial placement of the mat. Because she has not presented any affirmative evidence that Omni knew or should have known of the relevance of this evidence, Ms. Martin has failed to provide any proof of an obligation to preserve it.

Beyond failing to show an obligation to preserve a longer portion of the surveillance video, Ms. Martin is also unable to prove that any Omni employee had a culpable state of mind in allowing the videotapes to be overwritten in the normal course of business. A plaintiff can meet the burden of proof with regard to this element by showing either deliberate or negligent destruction of evidence, and the Court must consider "the degree of negligence or bad faith involved." *See Mazloum*, 530 F. Supp. 2d at 292 (quoting *More v. Snow*, 480 F. Supp. 2d 257, 275 (D.D.C. 2008)). Ms. Martin has not provided any evidence that would establish bad faith or negligent destruction of evidence. Instead, and for much the same reasons as explained above, the record shows that Mr. McKeython, the employee responsible for making the decision about

---

[13] Mr. McKeython testified that another employee, Jesse Whittaker, also viewed the security camera footage. He is now deceased. *See* McKeython Dep. at 13:15–21; 15:9–16:4.

how much footage to preserve, intentionally took steps to preserve the evidence he thought could be relevant. *See* McKeython Dep. at 34:8-9, 35:4-7. However, with regard to the footage for the hours or days preceding the accident, Mr. McKeython testified during his deposition that he simply did not foresee any need for the information. He stated that "it's just standard, you just record the accident," and that "it just seemed like it would be wasted video" to record the events leading up to the incident, which contained just "people, people, people, and . . . no incident." McKeython Dep. at 36:12–16. Ms. Martin has not provided any evidence to counter Omni's claim that Mr. McKeython acted in good faith. Because Ms. Martin has not shown culpability on the part of Mr. McKeython, or any other Omni employee, Ms. Martin is unable to meet her burden of demonstrating a culpable mind.

Accordingly, the Court concludes that an adverse inference on liability is not appropriate in this case. Without such an inference, and without any evidence in the record from which a reasonable jury could conclude either that Omni created the hazard or had actual or constructive notice of the hazard, Omni's motion for summary judgment must be granted.

## V.  CONCLUSION

For the foregoing reasons, Omni's motion for summary judgment (ECF No. 14), is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  August 30, 2016                                          RUDOLPH CONTRERAS
                                                                 United States District Judge